UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cr. No. 94-10287 |
| | ) | |
| FRANCIS P. SALEMME, et al. | ) | |
| | | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cr. No. 97-10009 |
| | ) | |
| JOHN MARTORANO | ) | |

MEMORANDUM AND ORDER

WOLF, D.J.                                          March 30, 1998

Upon careful consideration of the presentations of the parties
and independent analysis, I have decided that my recusal from
further participation in this case is neither necessary nor
appropriate. In view of the implications of this question for this
case, the reasons for this decision are described in detail in the
instant Memorandum and Order and in the Memorandum and Order issued
on February 13, 1998.[1]

---

[1]I issued the February 13, 1998 Memorandum and Order in
response to a request by the government that I analyze the issues
concerning my possible recusal before the parties were required
to do so formally. The instant Memorandum and Order should be
read in the context of the factual and legal analysis in the
February 13, 1998 Memorandum and Order.

I.   Summary

In the February 13, 1998 Memorandum and Order, I informed the parties that I did not then believe that my recusal was required by 28 U.S.C. § 455(b), which mandates disqualification if, among other things, a judge: is actually biased or prejudiced against a party; has personal knowledge of an evidentiary fact which is disputed in the pending proceeding; as a government lawyer participated in, or expressed an opinion about the merits of, the particular case in controversy; or is likely to be a material witness in the proceeding. I also expressed the view that my recusal is not appropriate pursuant to 28 U.S.C. § 455(a), which requires disqualification if a reasonable person, fully informed of the relevant facts, would question my impartiality unless the parties waive this ground for recusal pursuant to 28 U.S.C. § 455(e). I explained that the views expressed remained preliminary and ordered the parties to respond to the analysis in the February 13, 1998 Memorandum and Order.[2]

---

[2]The Order stated:

1.   The government shall, by February 19, 1998:

(a) With regard to 28 U.S.C. § 455(b), state whether it believes my recusal is required and, if so, describe with specificity the reasons for that belief, including, if applicable, any disputed evidentiary fact of which it is believed I have personal knowledge.

(b) With regard to 28 U.S.C. § 455(a), state whether (i) it believes a reasonable person could question my impartiality; (ii) it believes that reasonable minds could differ on this issue and, therefore, I have the legitimate discretion to decide

The parties each requested and were allowed additional time to file their responses. In the process, the parties were reminded of the obligation of all litigants to submit affidavits if they wished to supplement the factual record. See February 18, 1998 Memorandum and Order; Rule 7.1(B)(1) of the Local Rules of the United States District Court for the District of Massachusetts.

After studying the parties' submissions, on March 23, 1998, I held a hearing to permit them to address further the issue of my continued participation in this case.

In their submissions, the parties agreed that my disqualification is not required by § 455(b). See Government's Submission Regarding Recusal (March 2, 1998) at 1, 3; Defendants' Memorandum of Law Regarding Recusal (March 16, 1998) at 2. In the instant case this means that: (1) neither the government nor the defendants assert that I am actually biased or prejudiced with regard to any party; (2) neither the government nor the defendants claim that I have personal knowledge of any disputed material fact;

it either way; (iii) if so, how I should exercise that discretion; and (iv) in any event, whether it wishes to waive again, pursuant to § 455(e), any claim that I should disqualify myself because a reasonable person would question my impartiality.

(c) File a memorandum in support of its position if it is advocating my disqualification.

2. The defendants shall, by February 26, 1998, address the same issues and respond to the government's submission.

3. If necessary to resolve the question of my possible recusal, a hearing will be held on March 3, 1998, at 9:30 a.m.

3

(3) neither the government nor the defendants contend that while in the United States Attorney's Office from November 1981 to April 1985, I ever participated in, or expressed an opinion about the merits of, this case, which was not indicted until 1994; and (4) neither the government nor the defendants suggest that I am likely to be called as a witness in this case.

At the hearing on March 23, 1998, the government reiterated that it does not question my actual ability to be impartial. See March 23, 1998 Transcript ("Tr.") at 48. Thus, it should be recognized that the parties and I agree that there is no impediment to my ability to give each of them -- the government and the defendants -- a fair trial and to decide the matters I must determine on the basis of the evidence presented in court, rather than as a result of any information I acquired before I became a judge in 1985.[3]

The parties disagree, however, on the § 455(a) question of whether a reasonable person, fully informed of the relevant facts, would mistakenly question my impartiality. The government in effect asserts that I should recuse myself because this error would be made. The defendants disagree. Moreover, the defendants are again willing to waive, pursuant to § 455(e), any claim that they

---

[3]In the series of conferences I held after suspending the hearings on defendants' motion to suppress on January 21, 1998, the government consistently foreshadowed its formal position by reiterating that it perceived no basis for mandatory recusal under § 455(b), which among other things requires disqualification for bias or prejudice concerning a party. See January 28, 1998 Tr. at 6, 9, 21-22; February 4, 1998 Tr. at 4, 11, 28; February 27, 1998 Tr. (under seal) at 7; March 2, 1998 Tr. (under seal) at 11.

4

arguably may have for my disqualification under § 455(a).

        The government does not wish to waive this possible ground for recusal. Rather, the government contends that the new issue regarding recusal that I raised on January 21, 1998, and at least one other matter, provide a valid basis for it to withdraw the § 455(e) waiver that it provided on December 4, 1997 following what it admits was full disclosure of my relationship with some of the prospective witnesses in the now suspended proceedings. See March 23, 1998 Tr. at 14. This appears to be an unprecedented request. As explained in § III, infra, it is, in any event, not meritorious.

        There are, however, two matters that have been raised since December 4, 1997 as to which there has been no valid § 455(e) waiver. These are the December 21, 1984 memorandum of my conversation, as Deputy United States Attorney, with Assistant Attorney General Stephen Trott and my October 15, 1984 memorandum concerning the prosecution of Vincent Piro. See February 13, 1998 Memorandum and Order, Exhibits A and B. I address these matters respectively in §§ VI and V, infra. In addition, I have considered further, in § IV, infra, the August 8, 1983 FBI 209 report of statements made about me by defendant Stephen Flemmi (the "Flemmi 209").

        In analyzing the individual and cumulative effect of these matters I have applied the relevant legal principles, as they are described in the February 13, 1998 Memorandum and Order and amplified in this decision. See § II, infra. These principles include the following.

5

As the presiding judge, it is my duty to decide in the first instance whether a fully informed, reasonable person would question my impartiality because of the matters now at issue. In answering this question, I must keep in mind that a decision on disqualification must reflect not only the need to promote public confidence by assuring the appearance of impartiality, but also the need not to permit the reasonable perception that disappointed litigants can too easily prompt the disqualification of a fair judge in the hope of obtaining another judge more to their liking.

In deciding this matter, I recognize that no judge is indispensable. If I cannot properly continue to preside, some other judge will. I am obligated, however, to continue to preside unless some reasonable factual basis to doubt my impartiality or fairness is shown by some kind of probative evidence. "Were less required, a judge could abdicate in difficult cases at the mere sound of controversy or a litigant could avoid adverse decisions by alleging the slightest factual basis for bias." In re United States, 666 F.2d 690, 695 (1st Cir. 1981).

As indicated earlier, the parties agree that I can and will continue to preside fairly in this case. I have faith in the common sense of the people of this community. I find that properly informed,[4] reasonable people would not question my impartiality.

_____

[4]In considering what a knowledgeable, reasonable person would know, I have not found it necessary or appropriate to consider the information in the Factual Submission in Support of Defendants' Motion to Dismiss, which was filed under seal on October 6, 1997. Defendants believe that their submission strengthens their claim that I should not be disqualified in this case and request that it be unsealed. See Defendants' Memorandum

6

Thus, for the reasons described in the February 13, 1998 Memorandum and Order, as amplified in the instant Memorandum and Order, I will not recuse myself pursuant to § 455(a).

However, if an authorized representative of the government requests a stay and states that the government intends to file promptly with the Court of Appeals for the First Circuit a petition for a writ of mandamus to compel my recusal, I will stay this case to provide the Court of Appeals whatever time it needs to act on that petition.

## II.   The Legal Standards

28 U.S.C. § 455(a) states that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." "The case law fleshes out the bare-bone words of the statute." United States v. Voccola, 99 F.3d 37, 42 (1st Cir. 1996). "The test in [the First Circuit] for determining whether a judge's impartiality might reasonably be questioned is long established." Id. It is:

> "[w]hether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself or even necessarily in the mind of the litigant filing the motion under 28 U.S.C. § 455, but rather in the mind of the reasonable man."

of Law Regarding Recusal at 16-17. However, because that submission did not play a role in the decision not to recuse myself, and the reasons for continued impoundment that I described in my December 29, 1997 Memorandum and Order persist, United States v. Salemme, 1997 WL 810057, *7-8 (D. Mass. December 29, 1997), the defendants' request to unseal that submission is being denied. See United States v. Salemme, 985 F. Supp. 193, 194-95 (D. Mass. September 10, 1997).

7

Id. (quoting United States v. Cowden, 545 F.2d 257, 265 (1st Cir. 1976), cert. denied, 430 U.S. 909 (1977)) (emphasis added). Thus, the disqualification issue must be analyzed from the perspective of "'an objective, knowledgeable member of the public.'" El Felix de Puerto Rico v. The M/Y Johanny, 36 F.3d 136, 141 (1st Cir. 1994) (quoting In re United States, 666 F.2d at 695).

It is the duty of the presiding judge, rather than another judge, to decide whether his disqualification is required by § 455(a). See In re Martinez-Catala, 129 F.3d 213, 220 (1st Cir. 1997). As the Court of Appeals for the First Circuit has explained:

> It might seem odd that recusal issues should be decided by the very judge whose recusal is in question. But there are other considerations at work, including a desire for expedition and a concern to discourage judge shopping.

Id.

In any event, as Supreme Court Justice Anthony Kennedy has written:

> [Section] 455(a) is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause [there to be] reasonable grounds to question the neutral and objective character of a judge's rulings or findings. I think all would agree that a high threshold is required to satisfy this standard. Thus, under § 455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute.

Liteky v. United States, 510 U.S. 540, 557-58 (1994) (Kennedy, J., concurring). See also United States v. Conforte, 624 F.2d 869, 881 (9th Cir.)(Kennedy, J.), cert. denied, 449 U.S. 1012 (1980).

Consistent with this, several courts have held that recusal is appropriate only where a knowledgeable, reasonable person would

8

have a "significant" doubt concerning the judge's impartiality. <u>See</u> <u>Hook v. McDade</u>, 89 F.3d 350, 354 (7th Cir. 1996) ("Section 455(a) asks whether a reasonable person perceives a significant risk that the judge will resolve the case on a basis other than the merits."), <u>cert. denied</u>, 117 S. Ct. 718 (1997); <u>United States v.</u> <u>Chandler</u>, 996 F.2d 1073, 1104 (11th Cir. 1993) ("The test under Section 455(a) is whether an objective, disinterested, lay observer fully informed of the facts on which recusal was sought would entertain a significant doubt about the judge's impartiality."), <u>cert. denied</u>, 512 U.S. 1227 (1994); <u>United States v. Lovaglia</u>, 954 F.2d 811, 815 (2d Cir. 1992) (the test under § 455(a) is: "Would a reasonable person, knowing all the facts, conclude that the trial judge's impartiality could reasonably be questioned? Or phrased differently, would an objective, disinterested observer fully informed of the underlying facts, entertain significant doubt that justice would be done absent recusal?"). <u>See</u> <u>also</u> <u>In re Allied-</u> <u>Signal, Inc.</u>, 891 F.2d 967, 972 (1st Cir. 1989) (finding that parties' lack of objection for more than two years to law clerks' relationship to lawyers involved in the case "helps to support the district court's conclusion that a 'knowledgeable' objective observer would not have seen in the relationship a significant indication of partiality"), <u>cert. denied sub nom. ACW Airwall, Inc.</u> <u>v. United States District Court for District of Puerto Rico</u>, 495 U.S. 957 (1990).

Where, as here, only § 455(a) is implicated, there is no question that the judge is actually able to preside fairly. Section

455(a) "attacks the appearance of bias." <u>United States v. Chantal</u>, 902 F.2d 1018, 1023 (1st Cir. 1990).

> [I]f a judge proceeds in a case when there is (only) an appearance of impropriety in his doing so, the injury is to the judicial system as a whole and not to the substantial rights of the parties. The parties in fact receive a fair trial, even though a reasonable member of the public might be in doubt about its fairness, because of misleading appearances.

<u>United States v. Balistrieri</u>, 779 F.2d 1191, 1204-05 (7th Cir. 1985), <u>cert.</u> <u>denied</u> <u>sub</u> <u>nom.</u> <u>DiSalvo v. United States</u>, 475 U.S. 1095 (1986). <u>See</u> <u>also</u> <u>United States v. Murphy</u>, 768 F.2d 1518, 1540 (7th Cir. 1985) ("Section 455(a) is concerned with perceptions rather than actual defects in the administration of justice."), <u>cert.</u> <u>denied</u>, 475 U.S. 1012 (1986). That is why the parties may waive a § 455(a) ground for disqualification, but not a ground under § 455(b), which addresses actual impediments to the judge's ability to preside properly. <u>See</u> <u>Murphy</u>, 768 F.2d at 1540; <u>Chantal</u>, 902 F.2d at 1023.

Section 455(a) is intended to promote public confidence in the integrity of the judicial process. <u>Liljeberg v. Health Services Acquisition Corp.</u>, 486 U.S. 847, 858 n.7 (1988) (citing S. Rep. No. 93-419, p. 5 (1973); H. R. Rep. No. 93-1453, p. 5 (1974)). As the Court of Appeals for the First Circuit has explained, the reasonable public perception that lawyers or litigants can benefit from using § 455(a) "as a tactic to jettison an impartial judge whose slant on a case, as evidenced by his rulings, jeopardizes a party's chances for ultimate success" is, like the appearance of a biased judge, injurious to public confidence in the judicial

10

process. In re Cargill, Inc., 66 F.3d 1256, 1263 (1st Cir. 1995),

cert. denied, 116 S. Ct. 1545 (1996). See also In re Allied-Signal,

891 F.2d at 970. Therefore:

> [W]hen considering disqualification, the district court
> is not to use the standard of "Caesar's wife," the
> standard of mere suspicion. That is because the
> disqualification decision must reflect not only the need
> to secure public confidence through proceedings that
> appear impartial, but also the need to prevent parties
> from too easily obtaining the disqualification of a
> judge, thereby potentially manipulating the system for
> strategic reasons, perhaps to obtain a judge more to
> their liking.

In re Allied-Signal, 891 F.2d at 970 (citations omitted) (emphasis

in original). See also In re United States, 666 F.2d at 695.

Thus, the judge "must tread cautiously, recognizing, on the

one hand, the great importance to the judicial institution of

avoiding any appearance of partiality, while simultaneously

remaining aware of the potential injustices that may arise out of

unwarranted disqualification." In re Allied-Signal, 891 F.2d at

970. The February 13, 1998 Memorandum and Order and the instant

Memorandum and Order represent part of my effort to do this.

Generally, "[a] trial judge must hear cases unless some

reasonable factual basis to doubt his impartiality or fairness of

the tribunal is shown by some kind of probative evidence." Blizard

v. Frechette, 601 F.2d 1217, 1221 (1st Cir. 1979). This means,

among other things, that a decision to disqualify may not be

properly based on mere speculation, suspicion, or "erroneous

information published as fact in the newspapers." In re United

States, 666 F.2d at 695. See also United States v. Cooley, 1 F.3d

11

985, 993 (10th Cir. 1993); <u>United States v. Greenough</u>, 782 F.2d
1556, 1558 (11th Cir. 1986) (per curiam).

In enacting § 455(a), Congress stated that its standards
"should not be used by judges to avoid sitting on difficult or
controversial cases" such as this case. H. R. Rep. No. 1453, 93d
Cong., 2d Sess., 1974 U.S. Code Cong. & Admin. News 6351, 6355.
Thus, I must focus on the facts as established by the probative
evidence, rather than on information that is erroneous, incomplete,
or speculative, and decide whether those facts would cause a
reasonable person to question my impartiality.

III. <u>The Prior Waivers</u>

There is a threshold question regarding the scope of the
matters which should be considered in deciding whether a reasonable
person would question my impartiality. As described in the February
13, 1998 Memorandum and Order, at 8 n.2, 21-27 and 31-37, it has
been my practice to raise promptly any issue I perceive concerning
my possible disqualification because I do not wish to preside if my
participation is impermissible and also to minimize the risk that
a disappointed litigant will later have a reasonable basis for
claiming that decided issues should be reopened because my
participation was improper. Consistent with this, on December 4,
1997, I explained to the parties my associations with a number of
the prospective witnesses in the forthcoming hearings on the
motions to suppress and dismiss. <u>See</u> <u>id.</u> at 32-35. Later that day,
the government filed a statement which said, in part, that while it

12

believed that a reasonable person might question my impartiality because of the matters discussed, it waived any grounds to request my disqualification under § 455(a). Id. at 36-37. The government reaffirmed that waiver on December 11, 1997. Id. at 37.[5]

The government acknowledges that my association with a number of prospective witnesses was adequately disclosed before it provided its § 455(e) waiver on December 4, 1998. See March 23, 1997 Tr. at 14-16. The government, however, now contends that the emergence of other § 455(a) questions should permit it to withdraw its prior waivers. I have previously explained the reasons for my preliminary view that such a withdrawal is neither permissible nor in the interests of the administration of justice. February 13, 1998 Memorandum and Order at 70-71. This view has not changed.

The government has found no precedent for its position. See March 23, 1998 Tr. at 15-16. It is well-established, however, that a party "seeking disqualification of the judge must do so at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification." United States v. Kelly, 519 F. Supp. 1029, 1049 (D. Mass. 1981), aff'd sub nom. In re United States, 666 F.2d 690 (1st Cir. 1981). See also El Fenix, 36 F.3d at 141 n.6 (citing 7 James W. Moore et al., Moore's Federal Practice ¶ 63.07 [2.-2] (2d ed. 1993) ("[A] litigant who is aware of a potential

---

[5]On December 4, 1997, the defendants each stated that they did not believe that my recusal was required by § 455(a) or (b), and also waived any arguable § 455(a) ground for my recusal. February 13, 1998 Memorandum and Order at 35-36; December 4, 1997 Tr. at 64-76. The defendants reaffirmed their waivers on December 11, 1997. February 4, 1998 Memorandum and Order at 7; December 11, 1997 Tr. at 4-5.

13

ground of recusal should not be permitted to 'sandbag' that ground, hoping for a satisfactory resolution, but retaining a ground of attack on the judge's rulings.")); In re Cargill, 66 F.3d at 1261-62; United States v. Yu-Leung, 51 F.3d 1116, 1119-20 (2d Cir. 1995); E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1295 (9th Cir. 1992); United States v. Nobel, 696 F.2d 231, 236 (3rd Cir. 1982) (en banc), cert. denied, 462 U.S. 1118 (1983); In re International Business Machine Corp., 618 F.2d 923, 932 (2d Cir. 1980); Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 976 F. Supp. 84, 88 (D. Mass. 1997).

As the Court of Appeals for the First Circuit has noted, this principle is rooted in the recognition that courts "'cannot permit a litigant to test the mind of the trial judge like a boy testing the temperature of the water in the pool with his toe and, if found to his liking, decides to take a plunge." In re Cargill, 66 F.3d at 1263 (quoting In re United Shoe Mach. Corp., 276 F.2d 77, 79 (1st Cir. 1960)). These principles apply even more powerfully when, as here, an explicit waiver has been given.

In the present case, following December 4, 1997, the court made a series of rulings with which the government deeply disagreed, at times in an unprofessional manner. See, e.g., Note 6, infra; February 13, 1998 Memorandum and Order at 41-43. The evolution of this case now presents several new § 455(a) issues. To permit those issues to serve as a reason to allow the government to rely on grounds for recusal previously waived would abet at least the reasonable perception that the law regarding disqualification can

14

"be used as a tactic to jettison an impartial judge whose slant on a case, as evidenced by his rulings, jeopardizes a party's chances for ultimate success." In re Cargill, 66 F.3d at 1263. Indeed, the fact that the government now urges my disqualification in part on grounds that it previously expressly waived may affect "the calculus of public perception." Id. at 1264. See also February 13, 1998 Memorandum and Order at 70-71.

The principle that grounds for recusal waived previously are not revived by the discovery of new possible grounds for disqualification was applied by then Judge Anthony Kennedy in Conforte, supra. In Conforte, the defendant knew before trial that the presiding judge had rejected his application to join a bridge club. 624 F.2d at 879. Because he did not object to the judge's participation in the case on this basis before trial, he was deemed to have waived it, despite the post-trial discovery by the defendant of additional issues concerning recusal which the Court of Appeals addressed on their merits. Id. at 881. In the present case, the government expressly waived certain grounds for my possible recusal under § 455(a) and, as in Conforte, the emergence of new issues does not operate to permit further consideration of the grounds that were waived.

IV.   The August 8, 1983 Flemmi 209

An August 8, 1983 FBI 209 report states that Flemmi told FBI Special Agent John Connolly that he was concerned that, as Deputy United States Attorney, I might be a leak regarding the

15

investigation of La Cosa Nostra ("LCN") member Gennaro Angiulo in which Flemmi was an important informant. See February 13, 1998 Memorandum and Order at 23. That report also stated that Flemmi trusted Jeremiah O'Sullivan, the Chief of the Organized Crime Strike Force. Id. The Flemmi 209 was brought to my attention by the government on June 25, 1997. Id. at 23. It was discussed with the parties on June 27, 1997, when the parties prevailed upon me to revise my initial view and to conduct that discussion in a proceeding that was closed to the public rather than in open court. Id. at 23-25.

On June 27, 1997, the parties each stated that they did not believe that I was actually biased or prejudiced as a result of the statements contained in the Flemmi 209 or that a reasonable person would question my impartiality based on it. Id. at 24-25. See also June 27, 1997 Tr. at 108-11. Pursuant to § 455(e), the defendants also waived expressly any claim that they may have had that a reasonable person would question my impartiality because of the statements in the Flemmi 209. February 13, 1998 Memorandum and Order at 25. See also June 27, 1997 Tr. at 110-11.

Nevertheless, the FBI subsequently investigated the allegation that I had leaked information concerning the Angiulo case. See February 13, 1998 Memorandum and Order at 26. Despite finding no substantiation, the Department of Justice included me on the list of "possible law enforcement leaks" in the Executive Summary of its report to the Attorney General concerning the issues raised by Flemmi's claims of government misconduct. Id. at 27.

16

On September 17, 1997, in an _ex_ _parte_ session with the government that was convened for other purposes, I mentioned this entry in the Executive Summary and stated that if the government had revised its view and then felt that Flemmi's allegations merited my recusal, that issue should be dealt with before we resumed lengthy evidentiary hearings. Id.; September 17, 1997 Tr. at 12-13. Assistant United States Attorney Fred Wyshak assured me that I was not under investigation. September 17, 1997 Tr. at 15. Rather, I was told that there was no change in the government's view as to whether there was an issue concerning my continued participation in this case based on the Flemmi 209. Id. at 18-19.

As described more fully in the February 13, 1998 Memorandum and Order, at 39-41, on December 29, 1997 I granted Flemmi's request for an evidentiary hearing on his motion to dismiss to the extent that it relied on a claim of immunity; on January 5, 1998 I unsealed two Flemmi affidavits, which included many specific and sensational charges concerning the conduct of the FBI; and on January 6, 1998 I began the evidentiary hearings on defendants' motions to suppress and to dismiss.

By January 8, 1998, the government was complaining vehemently about the fairness of my rulings relating to those hearings. Id. at 42-43. Indeed, at one point after Assistant United States Attorney Brian Kelly, who was responsible for the witness, made an objection to the admission of a document based on relevance  which I overruled, Wyshak interrupted and complained so loudly and persistently that, for the first time in more than 12 years as a

17

judge, I felt compelled to raise the prospect of holding an attorney in contempt for the nature of his conduct in court. Id. at 42; January 8, 1998 Tr. at 167-69.[6]

I subsequently received a letter from a reporter seeking unsuccessfully to interview me and stating that on January 9, 1988, two employees of the Boston Herald editorial department received telephone calls informing them that there was "an FBI 209" in which Flemmi named me as "a source of information for the mob." See February 13, 1998 Memorandum and Order at 43-44. The newspaper subsequently received additional telephone calls stating I had been informed of the Flemmi 209. Thus, it appears that the telephone calls to the Boston Herald were made by someone with knowledge of the Flemmi 209 and of the proceedings that the parties persuaded me to close on June 27, 1998.

I do not know who called the Boston Herald about the Flemmi 209. I do not suspect that the prosecutors were involved.[7] However,

_____

[6]The following are some examples of the government's complaints. Wyshak: "I think what we're trying to do is get a fair hearing here." January 8, 1998 Tr. at 264. Herbert: "[T]he reason this [hearing] is so substantively unfair to the government apart from the fact that procedurally it shouldn't be happening . . . . " Id. at 277. Wyshak, after an objection on relevancy grounds was overruled, "You might as well put in the whole file. Why don't you just put the whole file in." Id. at 168. Wyshak, after an objection was overruled, "Well, of course, its overruled. Every objection is overruled." January 13, 1998 Tr. at 91. Wyshak: "This is an unfair proceeding, your Honor, to make those kinds of rulings." Id. at 142. See also Defendants' Memorandum of Law Regarding Recusal, at 23-27 (citing other transcript references).

[7]The prosecutors have at times not been informed of matters very significant to this case. For example, because the FBI refused a 1992 request by the United States Attorney Wayne Budd to confirm or deny Bulger's status, the prosecutors conducted the

18

particularly when viewed in the context of the genesis of the
recusal issue relating to the Piro case discussed in § V, infra, a
reasonable person would infer that the calls probably were made by
someone who hoped to disrupt, if not abort, the proceedings about
which the prosecutors were complaining.

In any event, I informed the parties of the inquiry I had
received from the Boston Herald concerning the Flemmi 209 and told
them of my renewed preference for unsealing the proceedings
concerning it. January 14, 1998 Tr. at 10-14, 21. I also expressed
the hope that the question of a possible leak concerning the Flemmi
209 would not distract anyone from the hearings being conducted or
disrupt those hearings. See id. at 15, 20-21. This hope, however,
was not realized. The government told me that it was investigating
whether O'Sullivan had known about the Flemmi 209 and discussed it

---

grand jury investigation that resulted in the January 10, 1995
First Superceding Indictment without knowing that Bulger and
Flemmi had been FBI informants. See January 15, 1998 Tr. at 46;
January 20, 1998 Tr. at 9; February 2, 1992 Memorandum from
Special Agent in Charge Thomas A. Hughes, submitted to the
defendants as Gianturco Jencks material. Nor did the prosecutors
know when they obtained the RICO indictments of Bulger and
Flemmi, which rely in meaningful measure on their alleged
involvement with the LCN, that the FBI's Principal Legal Adviser
in Boston had reviewed Flemmi's informant file and concluded that
he was "at least tacitly authorized" by the FBI to engage in "LCN
policymaking." See United States v. Salemme, 978 F. Supp. 343,
354 n.6 (D. Mass. May 22, 1997); Government's Response to
Magistrate Judge Cohen's Order Dated August 23, 1995, at 6 n.2;
Affidavit of Paul E. Coffey, Esq. dated November 13, 1995, ¶ 7
n.1.

In addition, for more than two years neither I nor Flemmi's
co-defendants were told of Bulger and Flemmi's history as FBI
informants -- matters highly relevant to issues being litigated
in these proceedings. See United States v. Salemme, 978 F. Supp.
at 354 (May 22, 1997 Memorandum and Order).

with me on August 11, 1983. <u>See</u> February 13, 1998 Memorandum and Order at 44; January 15, 1998 Tr. at 20-21.[8]

The government has presented no evidence that O'Sullivan or anyone else discussed the Flemmi 209 with me before the prosecutors informed me of it on June 25, 1997. The government now contends, however, that because of the disparaging remarks about me in the Flemmi 209 a reasonable person would question my ability to be fair to Flemmi in this case.

More specifically, in its most recent submission, which was signed by Assistant United States Attorney Wyshak, the government writes:

> It is indisputable that an objective observer <u>might</u> question whether the Court could be impartial if the defendants chose to use a document in which the defendant Flemmi accused the Court of being a leak to certain members of organized crime . . . . [T]his assessment need not be based upon the validity of Flemmi's claim nor upon an accurate assessment of the Court's ability to remain impartial. Surely, the Court cannot believe that such a reaction by an objective observer would be unreasonable.

Government's Submission Regarding Recusal at 20 (emphasis in the original). On June 27, 1997, however, Wyshak said just the opposite. When asked whether the government thought that a reasonable person would question my impartiality because of the statements in the Flemmi 209, Wyshak responded, "No, your Honor." June 27, 1997 Tr. at 109.

───────────────

[8]It was this representation relating to O'Sullivan that caused me to access my personal copies of letters and memoranda I wrote while in the United States Attorney's Office. Those documents contained no reference to the Flemmi 209, but did include the December 21, 1984 memorandum concerning my conversation with Assistant Attorney General Trott. <u>See</u> February 13, 1998 Memorandum and Order at 45.

In view of the government's position on June 27, 1997, and its
statement on September 17, 1997 that there was no change in the
government's view as to whether there was an issue concerning my
participation in this case based on the Flemmi 209, September 17,
1997 Tr. at 13, the government may not now rely on this ground for
my recusal. See Kelly, 519 F. Supp. at 1049-50. See also El Fenix,
36 F.3d at 141 n.6; In re Cargill, 66 F.3d at 1261-62; United States
v. Yu-Leung, 51 F.3d 1116, 1119-20 (2d Cir. 1995); E. & J. Gallo
Winery, 967 F.2d at 1295; Nobel, 696 F.2d at 236; Conforte, 624 F.2d
at 880; In re International Business Machine, 618 F.2d at 932;
Rosenberg, 976 F. Supp. at 88.

United States v. Yu-Leung is a particularly instructive case.
There the judge was told by the government that the defendant had
allegedly threatened the judge's life. 51 F.3d at 1119. The judge
did not regard the threat as serious. Id. The defendant "failed to
file a timely disqualification motion before [the judge] 'at the
earliest possible moment after obtaining knowledge of facts
demonstrating the basis for such a claim.'" Id. (quoting Polizzi v.
United States, 926 F.2d 1311, 1321 (2d Cir. 1991)). The judge never
made any statements, or otherwise acted in a way, indicating any
bias against the defendant. Id. at 1120. Thus, the Court of Appeals
found that there was no basis for requiring the judge's recusal. Id.

Similarly, in the present case, an informed, reasonable person
would know that I found, and find, the remarks about me in the
Flemmi 209 to be laughable. No one claims that I have since learning
of them exhibited any bias or prejudice concerning Flemmi. Flemmi

21

does not seek my disqualification under § 455(a) or (b). The government raised no § 455(a) objection for six months, and then did so only after a series of adverse rulings as to which it expressed extreme displeasure. In these circumstances, even if this ground for my possible recusal had not been waived, the statements about me in the Flemmi 209 would not cause a reasonable person to think that I would violate my duty to be fair to Flemmi and somehow punish him for the statements he reportedly made about me 14 years ago.

At the March 23, 1998 hearing, the defendants indicated for the first time that Flemmi might offer the 209 into evidence if necessary to rebut a possible claim that he recently contrived his alleged understanding that O'Sullivan knew that he was an informant and participated in providing some or all of the immunity Flemmi contends he was given. March 23, 1998 Tr. at 59, 85-86. Even if the Flemmi 209 is offered and introduced for this purpose, it would not cause a reasonable person to believe that I have personal knowledge of a disputed evidentiary fact.

Once again, there is no evidence that I knew about the Flemmi 209 before it was disclosed to me in the course of this case. There is no factual basis for finding that a reasonable person would doubt this. Thus, it is true, and also appears to be true, that the only information I have indicating that Flemmi trusted O'Sullivan was acquired by me in the performance of my judicial duties. Similarly, the only information I have that Flemmi distrusted me was obtained in the course of this case.

It is well established that generally "[k]nowledge of disputed

facts requires disqualification only if the knowledge has an extrajudicial source." United States v. Widgery, 778 F.2d 325, 328 (7th Cir. 1985). See also In re Martinez-Catala, 129 F.3d at 219; United States v. Kelley, 712 F.2d 884, 889-90 (1st Cir. 1983); United States v. Covens, 662 F.2d 162, 168 (2d Cir. 1981), cert. denied, 456 U.S. 916 (1982). As the Supreme Court has explained, "Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or prejudice motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." Liteky v. United States, 510 U.S. 540, 555 (1994). It is not claimed, let alone shown, that this standard has been met in this case.

I do know that Flemmi's reported fear that I was a leak to the LCN was unfounded. That, however, is irrelevant to the sincerity of any views he may have had in 1983 concerning whether O'Sullivan or I was trustworthy. Neither the government nor the defendants contend that the inaccuracy of Flemmi's information about me has actually injured my ability to judge him, and any testimony he may give, fairly. Once again, I believe a properly informed, reasonable person would not question my ability to do so either.

V.    The Piro Matter

Another issue concerning my possible disqualification arises out of my tenure as Chief of the Public Corruption Unit in the United States Attorney's Office during the investigation and

23

prosecution of State Representative Vincent Piro. This issue too was generated by a report in the media which was evidently based on information obtained from an unnamed source regarded as having reliable information about documents allegedly contained in confidential FBI files.

On December 18, 1997, the Boston Globe reported that a local television station (WCVB, Channel 5) had reported the night before that an internal FBI document reflected that former FBI Special Agent John Connolly had informed Bulger of an undercover operation in which Representative Piro took $5000 to influence legislation and that Representative Piro returned the money days after Bulger learned of the "sting." See February 13, 1998 Memorandum and Order at 48. The prosecutors read this story when it was published, but raised no question about it until January 21, 1998. March 23, 1998 Tr. at 35-36.

As I supervised the Public Corruption Unit while some of its members were investigating the Piro case, the media reports raised questions concerning whether I had while in the United States Attorney's Office known that Bulger was an informant and/or participated in an effort to determine whether he had been involved in compromising the Piro investigation. Either or both of these questions would, if true, have arguable, though uncertain, implications for my continued participation in this case.

As I told the parties on January 21, 1998, I recalled no suspicion that Piro was tipped off because of a relationship between the FBI and Bulger. January 21, 1998 Tr. at 56. At my suggestion,

the government interviewed John Pappalardo, the lead prosecutor in the Piro case. February 13, 1998 Memorandum and Order at 49. Pappalardo stated that he never associated the possible disclosure of information to Representative Piro with Bulger. Id. at 511. See also February 5, 1997 letter from government to court, transmitting FBI 302 report regarding interview of John Pappalardo dated January 23, 1998.

Although not voluntarily disclosed by the government, in response to inquiries from the court the government acknowledged that it has over the past two months done additional investigation and found no evidence that Bulger was mentioned or implicated in the investigation of a possible leak in the Piro case. See February 27, 1998 Tr. (under seal) at 20-21; March 23, 1998 Tr. at 36. The government has had unique access to the official records regarding the Piro case and to at least some of the potential witnesses. When questioned by the court, the government admitted that: (1) it has reviewed the Piro files and found no reference to Bulger, February. 27, 1998 Tr. (under seal) at 20-21; March 23, 1998 Tr. at 36; and (2) it has interviewed various witnesses and none said that Bulger was discussed in connection with a possible leak to Piro, March 23, 1998 Tr. at 36-38. The government also confirmed that if it had found any such evidence, it would have disclosed it to support its suggestion that I disqualify myself. February 27, 1998 Tr. (under seal) at 20-21.

It is illuminating to compare and contrast the instant case to United States v. Kelly, 519 F. Supp. 1029 (D. Mass. 1981), aff'd sub

25

nom. In re United States, 666 F.2d 690 (1st Cir. 1981). In Kelly, the then United States Attorney, Edward Harrington, moved, pursuant to § 455(a), to disqualify Judge Joseph Tauro from presiding in the retrial of State Senator James Kelly based upon two newspaper reports about a purported link between Senator Kelly and Judge Tauro 15 years before, when the judge was Chief Counsel to Governor John Volpe and the Senator was allegedly helpful to the Governor in a legislative committee's investigation of allegations of misconduct by the Governor and his "kitchen cabinet." Kelly, 519 F. Supp. at 1040-41. The FBI conducted an investigation of this allegation and the government appended the reports of all of its interviews to its motion to disqualify the judge. Id. at 1033 n.8, 1040. Based in part on those reports, Judge Tauro found that "the United States Attorney's own F.B.I. investigation failed to produce any evidence of any link between Kelly and me, either at the time of the Senate hearing or during the last fifteen years." Id. at 1042. See also id. at 1031. Thus, Judge Tauro found that the erroneous newspaper reports of his link to Senator Kelly did not create or contribute to a proper basis for his disqualification under § 455(a). Id. at 1031.

The Court of Appeals for the First Circuit affirmed. In re United States, 666 F.2d at 698. In doing so, it stated that:

> a judge considering whether to disqualify himself must ignore rumors, innuendos, and erroneous information published as fact in the newspapers. To find otherwise would allow an irresponsible, vindictive or self-interested press informant and/or an irresponsible, misinformed or careless reporter to control the choice of judge.

26

Id. at 695 (citations omitted).

In contrast to Kelly, in the current case the United States
Attorney did not submit for the record all of the relevant
information his investigation developed. This much, however, is
clear. The government's investigation has generated no evidence that
Bulger was suspected or discussed as involved in a possible leak in
the Piro case. Nor is there any other evidence that I knew or
suspected that Bulger was an informant. As I have said previously,
I have no recollection of suspecting that Bulger was an informant,
or participating in any investigation concerning him, while I was
in the United States Attorney's Office. January 21, 1998 Tr. at 56;
February 13, 1998 Memorandum and Order at 49. In the circumstances,
a properly informed, reasonable person would not believe that I have
any extrajudicial knowledge of Bulger's status as an FBI informant
or of any related, disputed evidentiary fact.

The media reports about Bulger's connection to the Piro case,
however, led to another issue which must be addressed. After the
government brought the December 18, 1997 Boston Globe article to my
attention, I found an October 15, 1984 memorandum which I wrote
regarding the Piro case that suggests that I was aware of suspicions
that FBI Special Agent John Morris gave former FBI Special Agent
Dennis Condon information that compromised the Piro investigation.
See February 13, 1998 Memorandum and Order at 49-51. The memorandum
also indicates that there were other suspected reasons why Piro
returned the money he had taken from the FBI undercover agent. Id.
I gave the memorandum promptly to the parties. Id. at 50. Prior to

27

finding the October 15, 1984 memorandum, I had no recollection of
Morris or Condon being involved in the Piro case. Indeed, I still
have no independent memory of this. Nevertheless, for purposes of
this recusal analysis, I will assume that in 1984 and 1985 I had
unconfirmed suspicions that Morris and Condon may have been
responsible for compromising the investigation of the Piro case,
which was not successfully prosecuted. See Liljeberg, 486 U.S. at
861.

In addition, although I have no independent recollection of the
events, memoranda I have since found indicate that as Deputy United
States Attorney I also dealt with Morris with regard to several
matters. See February 13, 1998 Memorandum and Order at 34 n.10, 59;
March 2, 1998 Order (unsealing two Memoranda dated March 10, 1982).[9]
One of those matters involved Condon providing information to Morris
for use in an investigation being conducted by an Assistant United
States Attorney. See March 2, 1998 Order (unsealing March 10, 1982

---

[9]As the document clearly reflects, in footnote 5 of the
Government's Submission Regarding Recusal the prosecutors
mischaracterize the March 10, 1982 memorandum that I wrote to the
"Files." In the case addressed, a defendant committed a crime,
and was caught, and was being interrogated by the FBI.  He then
began to cooperate with the FBI. By March 10, 1982, he had been
indicted and his trial was scheduled for the very near future. On
March 10, 1982, Morris was informing me of the indictment and
asking if the United States Attorney's Office would offer to
enter into a plea agreement to recommend no term of incarceration
so the defendant could continue to cooperate. In 1982, five years
before there were Sentencing Guidelines, the government had
unfettered discretion with regard to the sentence it could
properly recommend. I agreed to the recommendation Morris
requested on the condition that the Probation Department be
informed of the defendant's status as an informant and agree to
waive its practice of prohibiting probationers from operating as
informants.

Memorandum to John C. Doherty).

As the involvement of Morris and Condon in the Piro matter was not recalled, and therefore not disclosed, by me when I discussed each of them prior to obtaining the government's waiver on December 4, 1998, I do not view that waiver as binding with regard to them. See Potashnick v. Port City Construction Co., 609 F.2d 1101, 1114-15 (5th Cir.), cert. denied, 449 U.S. 820 (1980). Thus, it is necessary to address the question whether my prior association with Morris and/or Condon would cause a reasonable person to question whether I will be fair to each of the parties -- the United States and the four defendants -- in this case.

In his affidavits, Flemmi makes a number of claims concerning Morris, including a claim that Morris told Bulger and Flemmi that because they were valuable informants they would be protected by the FBI for anything that they did except committing murder. Affidavit of Stephen Flemmi dated June 25, 1997, ¶ 2. Condon has been mentioned previously mainly in connection with two matters relating to Flemmi. Flemmi asserts that following his return to Boston after being a fugitive from state charges of attempted murder, Condon told him that the federal fugitive charges against him had been dismissed. Affidavit of Stephen Flemmi dated December 22, 1997, ¶ 8. In addition, there is a FBI 302 which reports that Condon said that on one occasion he met Bulger and Flemmi at Morris' house. See August 25, 1997 letter from government to defense counsel, transmitting FBI 302 report regarding interview of Dennis Condon dated July 17, 1997, among other things. Connolly reportedly called

Condon in April 1997 to inquire whether he recalled Morris telling Bulger and Flemmi that they could do just about anything they wanted short of killing someone. Id.   Condon reportedly said he did not hear that statement. Id.

In addition, on March 2, 1998, the government submitted an affidavit from Condon which contradicts a portion of my description of his interview of me on June 9, 1997 -- before I had any reason to foresee that Condon might be a witness in this case -- as part of a background investigation being conducted in connection with Governor William F. Weld's prospective nomination to be Ambassador to Mexico. See February 13, 1998 Memorandum and Order at 35; Affidavit of Dennis Condon dated February 26, 1998, attached as Exhibit A to Government's Submission Regarding Recusal ("Condon Affidavit"). I am not legally obligated to accept Condon's version of our discussion as correct. More specifically, "under section 455, a judge is not compelled automatically to accept as true the allegations made by a party seeking recusal." In re Martinez-Catala, 129 F.3d at 220. See also Greenough, 782 F.2d at 1558 ("Section 455 does not require the judge to accept allegations by the moving party as true. If a party could force recusal of a judge by factual allegations, the result would be a virtual 'open season' for recusal."); Selfridge v. Gynecol, Inc., 564 F. Supp. 57, 58 (D. Mass. 1983); 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3550 (2d ed. 1984) ("If a party does move under § 455, and the motion is supported by an affidavit . . ., the court is not required to accept the factual

30

statements as true."). Rather, a judge "may contradict [the factual allegations in an affidavit in support of a motion to recuse] with facts drawn from his own personal knowledge." Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n, 872 F. Supp. 1346, 1349 (E.D. Pa. 1994). "To the extent that facts are in dispute, factual determinations are made by the judge whose recusal is in question . . . ." In re Martinez-Catala, 129 F.3d at 220.

As discussed below, I believe that to the limited extent that our accounts differ, my memory of what I said is more accurate than Condon's. However, I have analyzed the issue of my possible disqualification by assuming, without finding, that Condon is correct in his description of my statements. I conclude that such comments would not cause, or contribute to causing, a reasonable person to question my ability to be fair to the parties in this case.

As I recall, Condon called my chambers the week before Monday, June 9, 1997 -- rather than calling on June 9, 1998 as he states, Condon Affidavit at ¶ 3 -- to try to arrange an interview of me concerning Governor Weld. I was not able to see Condon that week, largely because I was absorbed in matters leading to the issuance of the June 6, 1997 Memorandum and Order in this case, which publicly disclosed for the first time that Bulger and Flemmi had been FBI informants. See United States v. Salemme, 978 F. Supp. 364 (D. Mass. June 6, 1997). That disclosure generated massive media attention over the weekend, much of which was critical of the FBI. See, e.g., Ralph Ranalli, Judge Blows Lid of FBI's Use of Mob

31

<u>Snitches</u>, Boston Herald, June 7, 1997; Kevin Cullen, <u>Use of Bulger</u>
<u>Raises Questions for FBI</u>, Boston Sunday Globe, June 8, 1997.

On June 9, 1997, my secretary called Condon to arrange for him
to interview me at 12:00 noon that day. In the past 25 years I have
been interviewed many times in the course of background
investigations for prospective federal appointees. In every prior
instance, the interview has been conducted by a member of the FBI.
Thus, I expressed surprise when Condon told me that he was employed
by the Department of State. I do not, however, believe that I used
the words Condon attributes to me in his affidavit, "You're not with
the State Department." Condon Affidavit at ¶ 3. In any event, Condon
told me that there were so many background investigations to be
conducted carefully that the Department of State now hired former
FBI agents like himself, among others, to do them, and he offered
to show me his credentials. I said that was not necessary. He did,
however, give me his business card.

I responded to Condon's questions regarding Governor Weld. At
the end of the interview, with a smile, Condon inquired whether
there was anything I wanted to ask him. <u>See</u> February 13, 1998
Memorandum and Order at 35 n.11. While I have at the end of other
interviews for prospective appointees at times been asked a general
question about whether there was anything else I would like to <u>say</u>
about the candidate, no interviewer has ever before inquired whether
there was anything I wanted to <u>ask</u> him. Knowing Condon was a former
FBI agent, I inferred that he was inquiring whether I had any
questions for him about this case, but felt that he was being

32

humorous. Id. I recall responding "no." Id. Condon says I responded that "you would not want to hear the questions I'd have for you." Condon Affidavit at ¶ 4.

The government suggests that, if true, Condon's version of our discussion would indicate to a reasonable person that I am biased against Condon, whose credibility I may have to judge in deciding the pending motions to suppress and dismiss, and therefore I should recuse myself. See Government's Submission Regarding Recusal at 23-26. However, even looking at the purported facts in the light most favorable to the government, the question is whether a reasonable person would doubt that I would be fair to the parties -- the United States and the four defendants -- because of unconfirmed suspicions 14 years ago in the Piro case and Condon's version of our conversation on June 9, 1997. In essence, it is necessary to determine whether a reasonable person would have a significant concern that I would violate my duty as a judge and decide the motions to suppress and/or the motion to dismiss in favor of the defendants, who are accused of crimes including murder and blowing-up a lawyer, not on the merits, but because of some hostility I harbor to Condon and/or Morris. I find that a reasonable person would not have this concern. The relevant case law is consistent with this conclusion.

Generally, familiarity -- or even a judge's friendship with prospective witnesses -- does not require a judge's recusal under § 455(a). See, e.g, Parrish v. Board of Comm'rs of Ala. State Bar, 524 F.2d 98, 103-04 (5th Cir. 1975) (en banc), cert. denied sub nom.

33

<u>Davis v. Board of School Comm'rs of Mobile County</u>, 425 U.S. 944 (1976); <u>United States v. Mavroules</u>, 798 F. Supp. 61, 63 (D. Mass. 1992); <u>Hirschkop v. Virginia State Bar Ass'n</u>, 406 F. Supp. 721, 724-25 (E.D. Va. 1975). This is the general rule because it is recognized that the public understands that judges are usually longstanding members of the community in which they serve and although they will inevitably encounter witnesses with whom they, or people close to them, have had positive or negative experiences, judges can and will ordinarily ignore those experiences and decide the matters before them impartially. <u>See</u> <u>In re United States</u>, 666 F.2d at 696-97.

There are, however, cases in which a judge's association with a witness will justify his recusal under § 455(a). The cases the government cites for this proposition are those that I brought to the parties' attention on December 4, 1997. December 4, 1997 Tr. at 31-34. I have considered those cases and find them to be distinguishable from the instant case. In <u>Hadler v. Union Bank and Trust Co. of Greensburg</u>, 765 F. Supp. 976, 978 (S.D. Ind. 1991), the judge disqualified himself because he was a close friend of a witness, who was an officer and stockholder of, and thus had a financial interest in, the defendant; the trial would be non-jury; the friend's credibility was likely to be pivotal in determining the issue of liability; and both parties agreed that his recusal was reasonable. Thus, after emphasizing that he would not have disqualified himself if the case only presented the issue of a friend appearing as a witness, <u>id.</u> at 977, the judge disqualified

34

himself. Similarly, in <u>United States v. Ferguson</u>, 550 F. Supp. 1256, 1260 (S.D.N.Y. 1982), the judge disqualified himself because the case required him to evaluate the credibility of a former law clerk with whom his relationship was very close and for whom his esteem was "high."

In contrast, the history of my contacts with Morris and Condon is limited and included ordinary, professional interactions which no one seems to remember. In addition, I was aware of unconfirmed suspicions that Morris and Condon may have played a role in compromising the Piro investigation.

Once again, the <u>Kelly</u> case provides very valuable guidance. At most, Condon and Morris are similarly situated to the Masiello brothers, who had testified before a special commission concerning alleged criminal conduct by members of Governor Volpe's "kitchen cabinet" that purportedly occurred during the period that Judge Tauro was the Governor's Chief Counsel. <u>In re United States</u>, 666 F.2d at 696. In affirming Judge Tauro's decision that a reasonable person would not question his impartiality, the Court of Appeals for the First Circuit emphasized that the Masiellos were not parties to the trial with any stake in the evidentiary rulings and, in any event, would not be repeating their previous testimony about members of the Volpe administration. <u>Id.</u> Similarly, neither Condon nor Morris are parties in this case and the court does not expect that they will be asked about the Piro matter.

Moreover, the Court of Appeals' analysis of whether recusal was required, in whole or in part, because of Judge Tauro's purported

35

link with a party, Senator Kelly, in the course of the earlier legislative investigation, is also instructive here. Indulging all inferences favorable to the government, the Court of Appeals assessed "whether the judge's awareness of Kelly's favorable conduct fifteen years ago would prompt a reasonable observer to believe that the judge would be partial toward Kelly in a current criminal trial." Id. In finding that this assumed fact did not cause or contribute to a requirement that Judge Tauro be recused, the Court of Appeals wrote:

> Whether or not [Kelly did] enough to generate a reasonable expectation of gratitude in the months immediately following the hearing, it surely lacks the significance to endure a decade and a half. Even, however, if one may assume the survival of some residue of gratitude after such a period, it is beyond contemplation that such gratitude would be of the weight necessary to cause a judge to jettison his impartiality and, in open court day after day, to violate his deepest professional and ethical commitments as a judge.

Id.

Thus, after considering the matters of the judge's possible partiality to the defendant and possible hostility to two key witnesses, the Court of Appeals concluded that finding recusal to be required "would reflect a more jaundiced view as to when there should be a reasonable doubt about a judge's impartiality than accords with the public perception." Id. at 697.

The Court of Appeals for the First Circuit's decision in In re United States is consistent with the rulings in many comparable cases involving § 455(a). For example, in Schurz Communications, Inc. v. Federal Communications Commission, 982 F.2d 1057, 1059 (7th Cir. 1992), Judge Richard Posner found that his disqualification was

36

not required under § 455(a) in an antitrust case even though he had,
15 years earlier, filed an affidavit as an expert witness in another
antitrust case on behalf of one of the litigants, CBS. There, Judge
Posner said:

> Would a reasonable person suppose that gratitude to a
> network for asking me to file an affidavit fifteen years
> ago, or dogmatic adherence to statements made in that
> affidavit and long forgotten, would prevent me from
> judging impartially in a much different kind of case
> though one with undoubted thematic affinities to the case
> in which I filed my affidavit? I believe not . . . .

Id. at 1062.

Similarly, in Cipollone v. Liggett Group, Inc., 802 F.2d 658,
659 (3rd Cir. 1986), cert. denied, 479 U.S. 1043 (1987), the judge
who wrote a decision for the Court of Appeals for the Third Circuit
had, 15 years before, represented the American Tobacco Company "in
a case involving a similar products liability claim." In finding
that the judge's recusal was not required under § 455(a), another
panel of the Court of Appeals wrote:

> Even if American Tobacco Company were a party to the
> Cipollone case, the long passage of time since [the
> judge's] last representation of that Company requires the
> conclusion that no reasonable person could question his
> impartiality.

Id. See also Rosenberg, 976 F. Supp. at 86.

In United States v. Hurst, 951 F.2d 1490, 1503 (6th Cir. 1991),
cert. denied, 509 U.S. 915 (1992), the Court of Appeals for the
Sixth Circuit held that it was "satisfied that a reasonable person
would consider the trial judge to be impartial" when he presided in
a criminal fraud trial involving a defendant against whom, as a
private lawyer, the judge had filed a suit alleging fraud.

37

_David v. City and County of Denver_, 101 F.3d 1344, 1348-50 (10th Cir. 1996), _cert. denied_, 118 S. Ct. 157 (1997), involved civil rights claims against a police chief and a number of police officers. The presiding judge, in a non-jury trial, had represented the police chief 20 years before. _Id._ at 1350. The judge also knew several of the law enforcement witnesses in the case, and had recently spoken to some of them, including the police chief, in connection with an investigation of the murder of the judge's son. _Id._ In affirming the judge's decision not to recuse himself under § 455(a), the Court of Appeals for the Tenth Circuit wrote:

> Although the test in this circuit is one of reasonableness, it is reasonableness tempered with a knowledge of the relevant facts. It is hardly possible for a judge with criminal jurisdiction to have no knowledge of some personnel in law enforcement. We must examine the judge's discretionary decision not to recuse both in light of the judge's duty to decide cases fairly and his duty to avoid impropriety, determined from an informed, reasonable viewpoint. "There is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is." _Hinman_, 831 F.2d at 939. Our review of these matters leads us to conclude that the trial judge did not abuse his discretion in denying Officer David's motion for disqualification pursuant to 28 U.S.C. § 455(a).

_Id._ at 1351.

Finally, on this point, Justice Kennedy's decision for the Court of Appeals for the Ninth Circuit in _Conforte_, _supra_, is also illuminating. _Conforte_, like _David_, _supra_, involved a non-jury trial. 624 F.2d at 872, 881. From his experience in the community, the presiding judge knew that the defendant in the criminal tax fraud case ran a legal house of prostitution. _Id._ at 881. He also knew from information acquired in his official capacity that the defendant was

38

a twice-convicted felon. <u>Id.</u> The judge had urged the University of Nevada not to accept a contribution from the defendant. <u>Id.</u> In these circumstances, then Judge Anthony Kennedy held that recusal was not required under § 455(a) or (b) because:

> We find no reasonable grounds for questioning the judge's impartiality because of bias or prejudice. While bias or prejudice may spring from many sources, often extrajudicial in their origin, the negative bias or prejudice of the kind alleged here will disqualify only if it is an attitude or state of mind that belies an aversion or hostility of a kind or degree that a fair-minded person could not entirely set aside when judging certain persons or causes.

<u>Id.</u>

In view of the foregoing, I conclude that a reasonable person would not question my impartiality in this case based on any matters relating to Morris or Condon, even if Condon's version of my statements to him on June 9, 1997 is, contrary to my memory, assumed to be true.

Moreover, it cannot properly be suggested that I should now be disqualified because I might be, or be perceived to be, hostile to Condon for furnishing his affidavit. The Court of Appeals for the First Circuit has recently held that a party has a right to criticize a judge,:

> [b]ut it is not her right, by doing so, to cause the disqualification of the judge. "A party cannot force disqualification by attacking the judge and then claiming that these attacks must have caused the judge to be biased against [her]." 13A Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, <u>Federal Practice and Procedure</u> § 3542 at 577-78.

<u>Federal Deposit Ins. Co. v. Sweeney</u>, 136 F.3d 216, 1998 WL 56351, *4 (1st Cir. 1998) (per curiam). This principle is even more compelling where, as here, only the statements of a witness, who is not a party,

are involved.

## VI.   The December 21, 1984 Memorandum

As described more fully in the February 13, 1998 Memorandum and
Order, at 45-47 and 56-58, on January 21, 1998 I suspended the
hearings on defendants' motions to suppress and to dismiss after I
discovered the memorandum that I wrote concerning a telephone call
I received on December 21, 1984, from Assistant Attorney General
Stephen Trott, when he was unable to reach the United States
Attorney, William F. Weld. See February 13, 1998 Memorandum and
Order, Exhibit A. The memorandum indicates that before calling the
United States Attorney and speaking to me, Assistant Attorney General
Trott had decided to authorize the application for the 1984-85
electronic surveillance which is now subject to a motion to suppress
in this case. He neither solicited nor received any advice on its
merits from me. The memorandum is captioned "Gary Crossen." As the
caption reflects, the Assistant Attorney General was calling to
discuss the Assistant United States Attorney who had drafted the
application and to complain about the style of the draftsmanship. I
suspended the hearings, however, to consult the parties concerning
whether the December 21, 1984 memorandum indicated that I should be
recused under § 455(b) because I had personal knowledge of a disputed
evidentiary fact and was likely to be called as a material witness
in the pending proceedings. See February 13, 1998 Memorandum and
Order at 47; January 21, 1998 Tr. at 12-13.

In the February 13, 1998 Memorandum and Order, at 55-59, I

40

analyzed this issue and expressed my preliminary view that the December 21, 1984 memorandum did not require my recusal under § 455(b). More specifically, I reiterated that I continue to believe that I did not participate in the process of preparing the application for the 1984-85 electronic surveillance, id. at 56, and could discern no disputed evidentiary fact of which my conversation with the Assistant Attorney General, or any possible follow-up that I did not recall, would give me personal knowledge, id. at 57-58. I did, however, order the parties to respond to my preliminary views and, particularly, to describe with specificity any disputed evidentiary fact of which it was claimed that I have personal knowledge. Id. at 72-73; see Note 2, supra.

The government requested and received an extension of time to respond to the February 13, 1998 Memorandum and Order in part because it wanted to "interview or reinterview numerous witnesses." See Government's Motion Requesting Additional Time (February 17, 1998) at 1; February 18, 1998 Order. In its submission, the government expresses its view that my recusal is not required under § 455(b). Government's Submission Regarding Recusal at 1, 3. The defendants concur. Defendants' Memorandum of Law Regarding Recusal at 2.

This means that the government, the defendants, and I agree that I do not have any personal knowledge of a disputed evidentiary fact concerning the 1984-85 electronic surveillance. Similarly, neither party has expressed a desire, or a basis, to call me as a witness in the pending proceedings. The question under § 455(a), therefore, is whether a well-informed, reasonable person would nevertheless

41

mistakenly believe that I have personal knowledge of a disputed evidentiary fact or am likely to be required to testify in this case. I find that a reasonable person would not make such an error.

As no party has stated either an intention or a reason to attempt to call me as a witness in this case, there is no factual basis for finding that a reasonable person would expect that I will be one.

Similarly, a reasonable person, knowing all of the relevant facts, would not believe that I participated in the preparation of the application for the 1984-85 electronic surveillance to the court. I do not recall being involved. See February 13, 1998 Memorandum and Order at 56; June 17, 1997 Tr. at 15. As Deputy United States Attorney I generally did not review applications for electronic surveillance. Moreover, the Organized Crime Drug Enforcement Task Force did not, as a practical matter, report to the United States Attorney through me. February 13, 1998 Memorandum and Order at 10. By December 1984, I had been nominated to be a judge and my activities in the United States Attorney's Office were then generally limited to supervising the Special Investigations Unit and writing an appellate brief. Id.

Although, once again, the government did not include it in its submission urging my recusal, the government's investigation has produced considerable information that is consistent with the conclusion that I did not participate in the preparation of the application for the 1984-85 electronic surveillance. For example, there is no reference to me in the Department of Justice's official

42

file concerning the 1984-85 electronic surveillance. See February 13, 1998 Memorandum and Order at 56-57; January 21, 1998 Tr. at 29.

The applicant for that electronic surveillance, Crossen, was interviewed at least twice. As the government disclosed in response to a direction from me, see February 27, 1998 Tr. (under seal) at 23, in a recent interview Crossen reported that he believes that I "did not ordinarily handle Title III matters." February 27, 1998 letter from the government to defense counsel (the "February 27, 1998 letter") at 1. In any event, Crossen has no memory of discussing the 1984-85 electronic surveillance with me. See FBI 302 report regarding interview of Gary Crossen dated July 25, 1997. Nor does he recall discussing the December 21, 1984 memorandum with me. See February 27, 1998 letter at 1.

Similarly, the government has interviewed Governor Weld on at least two occasions. As with Crossen, only one interview report has been provided to the defendants and the court. Governor Weld reportedly told the FBI that in view of the nature of my duties, I was not likely to have been involved in any discussions regarding the 1984-85 electronic surveillance. See FBI 302 report regarding interview of William F. Weld dated July 29, 1997. Governor Weld also told the government that he "does not recall ever discussing the merits of the 1984-85 [Drug Enforcement Administration ("DEA")] electronic surveillance with [me]." February 27, 1998 letter at 2. Nor does he recall any discussion with me concerning the December 21, 1984 memorandum. Id. at 1. He believes that he referred it to the former Chief of the Criminal Division in his office, Robert Mueller.

43

Id. at 2.

The government also interviewed Mueller at least once. Although no report of such discussion(s) has been provided, the government's letter indicates that Mueller recalls neither the 1984-85 electronic surveillance, nor my December 21, 1984 memorandum. See id. at 2. Thus, he provides no basis for anyone to believe that I participated in the preparation of the application for the 1984-85 electronic surveillance.

In addition, the government interviewed Janis Berry, who, as the Chief of the Organized Crime Drug Enforcement Task Force, was Crossen's supervisor. The December 21, 1984 memorandum indicates that a copy of it was sent to Berry. While she recalls the issue, Berry has no memory of talking to me about it. Id. at 2. Nor does the government claim that she provided any information indicating that I participated in the 1984-85 electronic surveillance. See id.

Finally, the government has stated that neither the affiant, DEA Special Agent Stephen Boeri, nor the Special Agent in Charge of DEA in Boston, Robert Stutman, recall speaking to me about the 1984-85 electronic surveillance. See February 13, 1998 Memorandum and Order at 56-57; January 21, 1998 Tr. at 8.

Thus, I conclude that a reasonable person, aware of the foregoing information, would not mistakenly believe that I participated in the preparation of the application for the 1984-85 electronic surveillance for submission to the court.

Nor is there a factual basis that would permit a reasonable observer to conclude that I have personal knowledge of any disputed

44

material fact concerning that electronic surveillance. More specifically, as described in detail in § V, supra, there is no evidence that would cause a reasonable person to believe that in December 1984 I knew, or even suspected, that Bulger or Flemmi were FBI informants.[10]

Finally, the government asserts that my recusal is required because certain former high-ranking law enforcement officials may be questioned about what they knew, or as a result of rumors should have known, about Bulger and Flemmi's status as FBI informants, and "an objective observer might believe that the Court would not be impartial because the Court might implicate itself in the very wrongdoing that the defendants allege against other similarly

_____

[10]Moreover, because there is no evidence that I was involved in the process of preparing the application for the 1984-85 electronic surveillance for submission to the court and there is no suggestion that I was insulated from that process in order to keep material information from the court, any knowledge or suspicion I might conceivably have had that Bulger and Flemmi were informants may, as a matter of law, be irrelevant. See United States v. Salemme, 1997 WL 810057 at *4-5 (December 29, 1997 Memorandum and Order); United States v. Sullivan, 586 F. Supp. 1314, 1319 (D. Mass. 1984) (denying suppression because "[t]here is no evidence in this case that the government intentionally concealed information from the court [by choosing an ignorant applicant]. If such a showing had been made, we would have a different case."); United States v. Tufaro, 593 F. Supp. 476, 485 (S.D.N.Y. 1983) (holding that a subordinate's knowledge would be attributed to the affiant, who was his supervisor), aff'd, 762 F.2d 991 (2d Cir.), cert. denied, 474 U.S. 826 (1985). See also United States v. Donovan, 429 U.S. 413, 435 n.23 (1977) (stating that "[t]here is no suggestion in this case that the Government agents knowingly failed to identify [all of those likely to be heard in incriminating conversations] for the purpose of keeping relevant information from the District Court that might have prompted the court to conclude that probable cause was lacking. If such a showing had been made, we would have a different case.").

situated members of the government." Government's Submission
Regarding Recusal at 23. There are several valid responses to this
claim.

First, for the reasons previously described, I was not
"similarly situated" to the witnesses in this matter and a properly
informed, objective person would recognize this. Second, the
government's argument suggests that it appears that I will be unfair
to the defendants because I am biased in favor of former law
enforcement officials with whom I worked. The defendants, however,
have not taken this position. Moreover, on December 4 and 11, 1997,
they expressly waived this possible ground for my recusal, among
others that they might arguably have had. December 4, 1997 Tr. at 68-
76; December 11, 1997 Tr. at 5. Most significantly, the government's
present contention is merely a reiteration of a concern about
appearances that it recognized on December 4 and 11, 1997, and itself
waived. February 13, 1998 Memorandum and Order at 36-37; December 11,
1997 Tr. at 5. For the reasons stated in § III, supra, this purported
basis for my recusal cannot be revived now.

## VIII.    Conclusion

For the foregoing reasons, I find that the matters relating to
my possible recusal under § 455(a) would not, individually or
cumulatively, cause a reasonable person to question my impartiality.
See, e.g., In re United States, 666 F.2d at 696-98 (despite Judge
Tauro's possible reason to be grateful to the defendant and arguable
motive to mistreat key witnesses, recusal was not required). As in

46

In re United States, to reach the opposite "result would reflect a more jaundiced view as to when there should be a reasonable doubt about a judge's impartiality than accords with the public perception." Id. at 697.

The government makes two additional arguments, however, that I will address briefly. At the March 23, 1998 hearing, the government argued that I should disqualify myself now because there will "inevitably . . . be additional evidence that bears on the recusal issue," March 23, 1998 Tr. at 25, and "although no one has indicated the need to call the Court as a witness, there are possibilities that the Court could become a witness in this case as this proceeding evolves," id. at 29-30. It is not, however, "inevitable" that additional recusal issues will arise in the future. It appears that the government has been investigating such possible issues since at least July 1997. It may reasonably be expected that the foreseeable issues have been fully presented by now.

I accept, however, that it is possible that new recusal issues will emerge in the future. This possibility, however, is not a proper basis for my disqualification. As described earlier, "[a] trial judge must hear cases unless some reasonable factual basis to doubt his impartiality . . . is shown by some kind of probative evidence." Blizard, 601 F.2d at 1221. Mere speculation or innuendo is not enough. In re United States, 666 F.2d at 695; Cooley, 1 F.3d at 993; Greenough, 782 F.2d at 1558.

Similarly, "unsubstantiated speculation" about the possibility that the judge will be required to be a material witness concerning

47

a disputed issue is not enough to require recusal. Murray v. Sevier, 929 F. Supp. 1461, 1467-68 (N.D. Ala. 1996). See also February 13, 1998 Memorandum and Order at 58, 60. The government's remark at the March 23, 1998 hearing is no more than such "unsubstantiated speculation." No knowledgeable, reasonable person would now expect that I am likely to be a witness in this case.

At the March 23, 1998 hearing the government also claimed that the "mere fact the Court would find it necessary to write a 73-page opinion on [the recusal questions] . . . bears witness to the fact that there is a substantial issue." March 23, 1998 Tr. at 47. This is a curious contention. It suggests that if I had merely written that "there is no reason for my disqualification," the issue would be unmeritorious.

As indicated earlier, in deciding questions of disqualification, judges are instructed to "tread cautiously, recognizing, on the one hand, the great importance to the judicial institution of avoiding any appearance of partiality, while simultaneously remaining aware of the potential injustices that may arise out of unwarranted disqualification." In re Allied-Signal, 891 F.2d at 970. The February 13, 1998 Memorandum and Order and the instant Memorandum and Order are part of my effort to heed that injunction.

In the circumstances of this case, there is no proper basis for my disqualification. My unwarranted recusal, however, would be unjust. Transferring this complex case to another judge would undoubtedly further delay the progress of the proceedings. The public, as well as the parties, however, has a legitimate interest

48

in seeing this case progress with all deliberate speed.

This case is more than three years old. Four superceding indictments have been returned. As a result, the defendants are facing a fifth set of charges. Those charges cover crimes allegedly committed over 30 years.

It took more than two years before the court learned, and compelled the government to disclose, that Bulger and Flemmi were FBI informants who, according to the Principal Legal Adviser to the Boston FBI office, were "at least tacitly authorized" to engage in "LCN policymaking" -- which is, in essence, one of the charges against them in this case. See United States v. Salemme, 978 F. Supp. at 354 n.6 (May 22, 1998 Memorandum and Order); Government's response to Magistrate Judge Cohen's Order Dated August 23, 1995, at 6 n.2; Affidavit of Paul E. Coffey, Esq. dated November 13, 1995, ¶ 7 n.1. The government for several months opposed the defendants' efforts to compel disclosure of the status of Bulger and others as FBI informants. United States v. Salemme, 978 F. Supp. at 345 (May 22, 1997 Memorandum and Order). When that effort failed, however, the government promptly stated that "[t]he United States does not dispute that disclosure is appropriate in the case of Bulger" as part of an effort to resist other disclosures. See Government's Motion for Reconsideration of the Court's May 22, 1997 Order (June 3, 1997) at 2. Similarly, after I decided the issue, the government "concede[d] that: the defendants [had] made a substantial showing that Mercurio was a government informant and may have been in possession of information about the location of the so-called induction ceremony

49

prior to entry of the roving order by Judge Nelson on October 27, 1989." Id. at 7-8; <u>United States v. Salemme</u>, 978 F. Supp. 364, 367 (D. Mass. June 6, 1997).

In addition, the evidence that the government proposes to use in this case requires the litigation of motions to suppress many electronic surveillances, conducted over more than 15 years, by federal and state law enforcement agencies. It took the government several months to produce the documents to which the defendants are entitled in connection with the lengthy evidentiary hearings that are still required on those motions.

The defendants, who under our Constitution are presumed to be innocent, have been detained for several years pending trial. Two defendants, George Kaufman and Frank Salemme, Jr., who were not detained, have died since being indicted.  If not dismissed, this case is still far from what may be as many as four separate trials. As more time passes, witnesses may also become unavailable. It would be an injustice to the defendants, and to the public, if the progress of this case were impeded by my unjustified recusal.

My disqualification would also injure public confidence in the administration of justice by suggesting both that a litigant can prompt the disqualification of a fair judge by alleging only the slightest factual basis for a claim of bias, and that judges will "abdicate in difficult cases at the mere sound of controversy." <u>In re United States</u>, 666 F.2d at 695. <u>See</u> <u>also</u> <u>In re Cargill</u>, 66 F.3d at 1263; <u>In re Allied-Signal</u>, 891 F.2d at 970.

Accordingly, I intend to continue to preside in this case. The

hearings which were suspended on January 21, 1998 will, therefore, resume on April 13, 1998. As indicated earlier, however, if an authorized representative of the government requests a stay and expresses an intention to file promptly with the Court of Appeals for the First Circuit a petition for a writ of mandamus seeking to compel my recusal, I will stay this case in order to provide the Court of Appeals for the First Circuit whatever time it needs to act on that petition.

IX. Order

In view of the foregoing, it is hereby ORDERED that:

1.   The government's requests to withdraw its waiver under 28 U.S.C. § 455(e) and that I recuse myself under 28 U.S.C. § 455(a) are DENIED.

2.   As I have not relied on the Defendants' October 6, 1997 Factual Submission in rendering this decision, their request to unseal it is DENIED.

3.   If the government intends to file promptly with the Court of Appeals for the First Circuit a petition for a writ of mandamus seeking to compel my recusal and, therefore, wishes to request a stay of this case, it shall so inform me and the defendants as soon as possible, but in any event by April 6, 1998.

4.   The defendants shall, by April 6, 1998, inform the government and the court of the next witnesses it intends to call in the hearings which are now scheduled to resume.

5.   The parties shall confer concerning any scheduling or

51

discovery issues concerning those witnesses.

      6.    A status conference will be held on April 8, 1998, at 3:00 p.m.

      7.    Unless otherwise ordered, the hearings suspended on January 21, 1998 will resume on April 13, 1998, at 9:00 a.m.

UNITED STATES DISTRICT COURT

52